IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**OREGON SHAKESPEARE**
**FESTIVAL ASSOCIATION,**                                  Case No. 1:15-cv-01932-CL

                          Plaintiff,

               v.
                                                                              **ORDER**
**GREAT AMERICAN INSURANCE**
**COMPANY,**

                          Defendant,

_____

CLARKE, Magistrate Judge

     Plaintiff Oregon Shakespeare Festival Association, the insured, brings this cause of

action against first party insurance carrier defendant Great American Insurance Company for

denial of coverage under a property insurance policy. Plaintiff claims it suffered loss or damage

to property when smoke from a nearby wildfire filled the Allen Elizabethan Theatre in the

summer of 2013, causing Plaintiff to cancel performances and lose business income. This case

comes before the Court on the defendant's amended motion for summary judgment (#25) and

Plaintiff's cross motion for partial summary judgment (#17). For the reasons below, defendant's

motion is GRANTED in part and DENIED in part, and Plaintiff's motion is GRANTED.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## FACTUAL BACKGROUND

Plaintiff Oregon Shakespeare Festival Association (OSF) operates the Oregon Shakespeare Festival in Ashland, Oregon. The Festival takes place at three live stage production venues owned by OSF. Two of the venues, the Angus Bowmer Theatre and the Thomas Theatre, are fully enclosed. The third venue, the Allen Elizabethan Theatre, is an open-air, partially

enclosed structure. It is walled and enclosed, but the roof does not extend over the entirety of the top of the building.

In late July and early August, 2013, smoke from several different wildfires was present in the area. The fires caused smoke, soot, and ash to accumulate on the surface of the hard plastic seats and concrete ground of OSF's open-air theater. According to Director of Production Alys Holden, the ash and soot consisted of "very small ashes and dust." The smoke, ashes, and dust permeated the interior of the theatre, coating the seating, HVAC, lighting, and electronic systems.

OSF's Executive Director Cynthia Rider decided to cancel a total of four separate evening performances due to health concerns from the poor air quality caused by the wildfire smoke. The performances had been scheduled to take place at OSF's Allen Elizabethan Theatre at 8:00 p.m. on July 30, July 31, August 1, and August 7, 2013.

Ms. Rider reached her decision on the night of each scheduled performance after consulting with a special committee, of which she was the chairperson, comprised of a total of eight OSF employees and managers. The committee included: OSF's Associate Producers, Kimberley Barry, Claudia Allen, and Ted DeLong, Director of Production Alys Holden, Associate Artistic Director Christopher Acebo, its Director of Marketing and Communications Mallory Pierce, and Director of the American Revolutions Program Alison Carey. The committee created, and relied upon, documents setting forth specific criteria regarding potential performance cancellation.

Each evening during late July and early August of 2013, the committee met at 6:15-6:30 p.m. to determine whether or not to cancel the regularly scheduled 8:00 p.m. performance at the Allen Elizabethan Theatre. Decisions were announced by 7:00 p.m., prior to each performance.

The committee also assigned a "smoke team" each evening that performances went on as scheduled. The members of the "smoke team" met at 7:30 p.m. and stayed through intermission or the end of the performance, depending on weather conditions. The "smoke team" determined whether any last minute cancellations needed to take place.

The committee's decisions each evening included an analysis of: (1) current weather conditions, (2) the forecast for the remainder of the evening, and (3) the health status of the actors. Specifically, if the Air Quality Rating was "Good to Moderate," the performance would continue as planned. If the Air Quality Rating was "Unhealthy to Hazardous," the performance would be cancelled. If the Air Quality Rating was "Unhealthy for Sensitive Groups," the committee would make a determination based on the following, specific criteria:

1. Ashland Air Quality / Particle Data (specifically the one hour average PM2.5 and instantaneous reading taken during the show from the Ashland monitoring device "R2D2")
2. Trending of the air quality data
3. Forecast for evening – consultation with the Weather Service Office
4. Visibility
5. Current air quality conditions in and around the Elizabethan Theatre
6. Conditions in Medford (only if Ashland data is unavailable or Medford conditions are pertinent to the Ashland weather forecast)
7. Is performance possible with alterations, e.g., slowing down stage combat, etc?
8. Is performance possible with curtain time delay (latest start time 9:00 p.m.)?

During the show, the committee also relied on feedback from cast members regarding their physical ability to continue performing.

Executive Director Rider testified during her Examination Under Oath that the reason OSF cancelled the performances was due to "air quality from surrounding forest fires." OSF's Associate Producer of Stage Management, Kimberley Barry, confirmed that the performances were cancelled due to poor air quality. Ms. Barry testified that there "had been concerns about the forest fires and what affect the smoke related to fires could affect the well-being of the

company and audience. The company, meaning the actors and crew working in the outdoor theater." Jerry Roos, OSF's Director of Finance and Administration, testified that, in making the decision to cancel performances, OSF's "primary concern was for our acting company and our production staff and our patrons."

In addition to the concern expressed by OSF employees and managers, a number of the OSF actors and performers, including the actors' union equity deputy, were concerned about performing in smoky conditions. According to Ms. Barry, after a union representative spoke with OSF actor Anthony Heald, OSF was told to cancel performances due to "health concerns because of air quality."

Ms. Rider confirmed that no federal, state, local agency, or public authority of any kind, such as the Environmental Protection Agency or Oregon Department of Environmental Quality, ordered cancellation of the performances due to air quality concerns. Ms. Rider also admitted that OSF does not know which fire caused the smoke, or how far away the fire was located.

During defendant GAIC's investigation of the claim, OSF representatives and employees confirmed that, even though there was some temporary accumulation of soot and ash on the surface of the open-air theater, OSF did not suffer any permanent or structural damage to its property. Indeed, it is undisputed that the performances were cancelled due to poor air quality and the related health concerns.

The outdoor theater floor is made of concrete and the seats are made of hard resin plastic. OSF employees testified that they cleaned up the soot and ash well before any scheduled performances each day using rags and buckets of water; no special chemicals or other cleaning equipment were needed. OSF employees testified that it took them between 20 minutes and one hour each day to clean up the soot and ash in the open-air theater.

OSF employees were not paid overtime for the time spent cleaning the soot and ash. OSF employees testified that their schedules remained the same, but their duties were slightly reallocated to deal with the soot and ash. OSF employees changed air filters three or four times during this period. OSF employees completed the clean-up by mid-afternoon each day, and OSF never had to cancel an 8:00 p.m. evening performance due to clean-up.

There were days during the smoky time period that soot or ash landed on the seats in the open-air theater and OSF chose not to cancel the performance that evening. Ms. Rider stated that the decision of whether to remain open or cancel was based on the perceived "level of particulates in the air" and considerations such as "[w]ere your eyes itchy, was your throat [itchy], were you having trouble breathing" were factors OSF considered in making the decision to cancel performances. Ms. Tacconi stated that if the air quality had been better, OSF would have been in a position to hold performances each night.

On July 30, 2013, (the date of the first performance cancellation), the Air Quality Index ("AQI") registered a high of 400 PM2.5, which constituted "very unhealthy" conditions. On July 31, 2013, (the date of the second performance cancellation), the AQI again registered a high of 400 PM2.5. On August 1, 2013, (the date of the third performance cancellation), the AQI registered a high of around 250 PM2.5, which constituted "unhealthy" conditions. On August 7, 2013, (the date of the fourth performance cancellation), the AQI registered a high of approximately 220 PM2.5, which constituted "unhealthy" conditions. On August 6, 2013, (a night in which performances were not cancelled), the AQI registered a high of approximately 150 PM2.5, which also constituted "unhealthy" conditions. On August 8, 2013, (a night in which performances were not cancelled), the AQI registered a high of approximately 200 PM2.5, which constituted "unhealthy" conditions.

## APPLICABLE INSURANCE POLICY PROVISIONS

The applicable Policy terms state:

### Building and Personal Property Coverage Form

A.  Coverage

We will pay for direct physical loss of or damage to covered property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
. . .

### Business Income (and Extra Expense) Coverage Form

A.  Coverage
1.  Business Income
. . .
We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.
. . .

The policy, amended by endorsement, defines "period of restoration," in part, as:

The period of time that:

a.  Begins:

1.  at the time of direct physical loss or damage for Business Income Coverage; or
2.  immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

b.  Ends on the earlier of:

1.  The date when the property at the described premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality; or
2.  The date when business is resumed at a new permanent location.

**Causes of Loss – Special Form**

A. Covered Causes of Loss

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this Policy.

B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

     i.    Ordinance or Law
           . . .
     ii.   Earth Movement
           . . .
     iii.  Governmental Action
           . . .
     iv.  Nuclear Hazard
           . . .
     v.   Utility Services
           . . .
     vi.  War and Military Action
           . . .
     vii. Water
           . . .
     viii. "Fungus," Wet Rot, Dry Rot, and Bacteria
           . . .

2. We will not pay for loss or damage caused by any of the following:

    a. Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any: (1) electrical or electronic device, appliance, system, or network; or (2) device, appliance, system or network utilizing cellular or satellite technology.
       . . .
    b. Delay, loss of use or loss of market.
    c. Smoke, vapor or gas from agricultural smudging or industrial operations.
    d. (1) wear and tear, (2) rust or other corrosion, decay, deterioration, hidden or latent defect. . . (3) smog, (4) settling, cracking, shrinking or expansion, (5) nesting or infestation. . . (6) mechanical breakdown. . ..
       . . .

### DISCUSSION

I.    **Plaintiff's claim is covered by the policy because the Elizabethan Theatre
sustained "physical loss or damage to property" when the wildfire smoke
infiltrated the theater and rendered it unusable for its intended purpose.**

Determining whether insurance coverage exists is a two-step process under Oregon law.
The insured has the burden of proof of first establishing that the loss falls within the scope of the
policy's coverage grant. *ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.*, 222 Or. App. 453,
465, 194 P.3d 167, 174 (2008) (citations omitted). If the insured meets its initial burden, the
insurer then bears the burden of establishing that the loss is excluded by specific language in the
policy. *Id.* However, for a court interpreting an insurance policy's terms in Oregon, "[t]he
primary and governing rule of the construction of insurance contracts is to ascertain the intention
of the parties." *Hoffman Const. Co. of Alaska v. Fred S. James & Co. of Oregon*, 313 Or. 464,
469, 836 P.2d 703, 706 (1992) ("*Hoffman*") (quoting *Totten v. New York Life Ins. Co.*, 298 Or.
765, 770, 696 P.2d 1082 (1985)). The court determines the intention of the parties based on the
terms and conditions of the insurance policy. *Id.* (citing ORS 742.016). If the insurance policy
does not define the crucial term, the court is required to give the term meaning in the context of
the dispute. *Id.*

If the parties submit two or more plausible interpretations of the term, the court must
examine the interpretations in light of the particular context of that term in the policy, as well as
the broader context of the policy as a whole. *See Hoffman*, 313 Or. at 470, 836 P.2d at 706. "If
two or more plausible interpretations of the term withstand scrutiny, i.e., continues to be
reasonable," after such an examination, the term is considered ambiguous. Such an ambiguity
"justifies application of the rule of construction against the insurer." *Id.* "That is, when two or
more competing, plausible interpretations prove to be reasonable after all other methods for

resolving the dispute over the meaning of particular words fail, then the rule of interpretation against the drafter of the language becomes applicable, because the ambiguity cannot be permitted to survive." *Id.*

### a. The plain meaning of the terms of the Policy favors coverage.

In this case, the parties disagree over the term "direct physical loss of or damage to covered property." The parties agree that the Allen Elizabethan Theatre is "covered property," but they dispute whether the smoke that filled the partially-enclosed, open-air facility constituted "direct physical loss or damage," such that another provision – the loss of business income coverage – is activated. The insurance policy does not define the term "direct physical loss or damage."

Plaintiff defines the terms in question by relying on Webster's Dictionary, defining "physical" as "of or belonging to all created existence; relating to or in accordance with the laws of nature; of or relating to natural or material things as opposed to things mental, moral, or spiritual." Plf. Mtn. 14 (#17) (citing Webster's Third New Int.l Dictionary 1339 (unabridged ed. 1993)). Plaintiff distills this definition down to mean a "natural or material thing." *Id.* "Loss" is defined as the "state or act of being destroyed or placed beyond recovery" or the "amount of an insured's financial detriment due to the occurrence of a stipulated event…" *Id.* "Damage" means "loss due to injury; injury or harm to person, property, or reputation." *Id.* Plaintiff asserts that these definitions, taken together, create a plain meaning of "physical loss or damage" as "any injury or harm to a natural or material thing." Based on this interpretation, Plaintiff claims that the wildfire smoke caused injury or harm to the interior of the theater, which includes the air within the theater.

Defendant disputes this definition, arguing that the air in the theater cannot be insured by the policy because such air is not "property." The policy itself does not give any indication that the air within a covered building cannot suffer contamination or infiltration such that "physical loss of or damage to property" exists.

Defendant nevertheless stresses that the loss or damage must be *physical*, but does not give a sufficient explanation for why air is not physical. Certainly, air is not mental or emotional, nor is it theoretical. For example, if the dispute were over the theater's reputation or its fair market value, the Court might be inclined to agree with the Defendant. By contrast, while air may often be invisible to the naked eye, surely the fact that air has physical properties cannot reasonably be disputed. Defendant's contention implies a different definition of "physical" altogether. Defendant implies that, in order to be "physical," the loss or damage must be *structural* to the building itself. Defendant does not provide any evidence from within the policy to show that the plain meaning of the term "physical" includes such a limitation.

Additionally, defendant argues that the smoke in the air at the theater did not require any "repairs" to the structure of the property; therefore, there was no "period of restoration" such that business income loss coverage would apply. The applicable terms state:

A. Coverage

    1. Business Income

       . . .

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage muse be caused by or result from a Covered Cause of Loss. . ..

The policy, amended by endorsement, defines "period of restoration," in part, as:

The period of time that:

    a.  Begins:

        1.  at the time of direct physical loss or damage for Business Income Coverage; or
        2.  immediately after the time of direct physical loss or damage for Extra Expense Coverage;

        caused by or resulting from any Covered Cause of Loss at the described premises; and

    b.  Ends on the earlier of:

        1.  The date when the property at the described premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality; or
        2.  The date when business is resumed at a new permanent location.

In this case, it is undisputed that the interior of the building had to be cleaned, the air filters had to be changed multiple times, and smoke in the air within the theater had to dissipate before business could be resumed. While the cleaning of the space took merely a few hours, the dissipation of the smoke took several days, during which time the Plaintiff was forced to suspend operations. Defendant claims that this period of time cannot be considered "restoration" because no *structural* repairs were necessary. Once again, the Court can find no such limitation within the terms of the policy.

The Court finds that defendant's interpretation, which would add the word "structural," and exclude the air within the building, is not a plausible plain meaning of the term "direct physical loss of or damage to property." However, even if such an interpretation were plausible, the text and context of the policy would preclude such a definition.

    **b.  Text and context of the Policy favors coverage.**

The Court has already considered the specific terms of the policy requiring a "direct physical loss of or damage to property," and a "period of restoration." The Court now considers the policy as a whole to determine if the terms could reasonably include the wildfire smoke that infiltrated the interior of the theater in this case. The Defendant points to three different exclusions to show that the smoke should be excluded from coverage.

### i.    Delay, loss of use, loss of market

Defendant does not specify how the exclusion for "delay, loss of use or loss of market" applies in this case. The delay and loss of use of the theater for performance was caused by smoke. Thus it was caused by the claimed damage. In any other situation, if a delay or loss of use of covered property was caused by a claimed damage to the property, yet was excluded from coverage, that exclusion would void the entire purpose of the policy. This interpretation is unreasonable. The exclusion only makes sense in the context of the policy when a delay external to the damage causes a loss of use. For instance, in this case, if the actors and production staff of OSF were not ready to perform at the scheduled time, causing a delay or cancellation of a show, such loss of business income would not be covered by the policy. There is no contention of an external delay here.

### ii. "Smog" or "smoke"

"Smog" is a specific exclusion contained in the policy, but the term is not defined by the policy. Defendant argues that the dictionary definition of smog includes smoke. Citing the Oxford Dictionary, defendant defines smog as "fog or haze combined with smoke and other atmospheric pollutants." "Haze" is defined as "a slight obscuration of the lower atmosphere, typically caused by fine suspended particles." Therefore, according to the defendant, the wildfire smoke in this case is excluded from coverage.

First, there is no evidence in the record that there was any fog or haze with which the smoke could have combined to create "smog" in this case. Second, the defendant's interpretation would require the Court to ignore the fact that "smoke" is specifically excluded from coverage by the policy in another provision. *Leach v. Scottsdale Indemn. Co.*, 261 Or. App. 234, 242, 323 P.3d 337 (2014) (any proposed interpretation that requires a court to disregard a provision of the policy is not reasonable as a matter of law). The specific smoke exclusion, however, is limited to "smoke, vapor or gas *from agricultural smudging or industrial operations*" (emphasis added). Such a limited exclusion does not apply to this case, as there is no evidence of agricultural smudging or industrial operations. Applying either exclusion to the wildfire smoke in this case is not a reasonable interpretation of the policy terms.

### iii. Pollutants

Defendant argues a similar exclusion here, attempting to construe the wildfire smoke as a "pollutant." The context of the pollutant exception demonstrates why it does not apply in this case. Under the policy, the "period of restoration" excludes:

> any increased time required due to the enforcement of or compliance with any ordinance or law that . . . requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to, or assess the effects of "pollutants."

"Pollutants" means "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." This provision does not apply because there is no required "enforcement of or compliance with any ordinance or law." Even if there were such a requirement, "pollutants" would not include wildfire smoke for the same reason discussed above regarding "smog." If the policy drafters wanted to exclude smoke other than smoke "from agricultural smudging or industrial operations," they could have done so.

Based on the text and the context of the policy, it is not reasonable to exclude wildfire

smoke from policy coverage. The Plaintiff's interpretation that the infiltration of smoke into the

interior of the theater is a covered "physical loss of or damage to property" remains reasonable.

### c. Case law favors coverage.

Plaintiff's interpretation of the policy terms remains the only reasonable interpretation

offered by the parties. However, even if both parties' interpretations were reasonable, case law

from Oregon and other jurisdictions would favor the Plaintiff's argument.

In *Farmers Ins. Co. of Oregon v. Trutanich*, 123 Or. App. 6, 858 P.2d 1332 (1993), the

Oregon Court of Appeals was asked to determine whether or not a "pervasive odor" in a

residential home caused by a subtenant's illegal methamphetamine operation was considered a

"direct physical loss." The court concluded that odor was "physical," because it damaged the

house. The court distinguished *Wyoming Sawmills, Inc. v. Transportation Ins. Co.*, 282 Or. 401,

578 P.2d 1253 (1978), in which a manufacturer's defective studs were determined not to be

covered by a similar policy provision because there was no physical damage to the building, only

a loss in value, or depreciation. The court determined that *Trutanich* was different because there

was "evidence that the house was physically damaged by the odor that persisted in it." 123 Or.

App. at 10, 858 P.2d at 335.

*Trutanich* was cited favorably along with *Largent v. State Farm Fire & Cas. Co.*, 116

Or.App. 595, 842 P.2d 445(992), by District of Oregon Judge Hubel to stand for the proposition

that "physical damage can occur at the molecular level and can be undetectable in a cursory

inspection." *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, 1999 WL 619100, at *6 (D. Or. Aug.

4, 1999). Judge Hubel cautioned that "recognition that physical damage or alteration of property

may occur at the microscopic level does not obviate the requirement that physical damage need

be distinct and demonstrable." *Id.* at \*7. In making the determination, "courts consider the nature and intended use of the property itself and the purpose of the insurance contract." *Id.* at \*6.

In another District of Oregon case, a hammer was left behind in the Plaintiff's furnace and disintegrated, causing the furnace to be contaminated with lead particles. *Stack Metallurgical Services Inc. v. Travelers Ind. Co. of Connecticut*, 2007 WL 464715 (D. Or. 2007) ("*Stack*"). The furnace could no longer be used for treating medical devices because those devices would then also be contaminated. The defendant insurance company argued that the only "direct physical damage" sustained to plaintiff's property was the loss of the hammer that disintegrated in the furnace. The insurance company asserted that, because the furnace could still be used to treat materials other than medical devices, it did not suffer "physical damage," and therefore the Plaintiff could not make a claim under the business income coverage provision. *Id.* at \*7. The court disagreed. Though the terms "direct physical loss" and "physical damage" were not defined in the policy, the court determined that, because the lead particle contamination "prevented the furnace from being used for its ordinary expected purpose, [it] is fairly characterized as a 'direct physical loss of or damage to' the furnace." *Id.* at \*8.

Additionally, this Court finds a District of New Jersey case to be extremely persuasive based on the similarities of the facts and the insurance policy terms at issue. In *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2014 WL 6675934, at \*3 (D.N.J. Nov. 25, 2014), an accidental release of ammonia into a packaging facility caused the facility to be shut down for one week while the ammonia dissipated. The evidence in the record showed that in order to remedy the problem, the facility had to "air the property" and hire an outside company "to do the cleanup. . . Wash down anything with water . . . [They] brought in dry ice, trying to

neutralize the [ammonia] inside the plant. Set up fans and all that." *Id.* at *4. The defendant

insurance company asserted that the incident was not covered because "physical loss or damage"

necessarily involves a "physical change or alteration to insured property requiring its repair." *Id.*

at *2. The court disagreed, noting that "while structural alteration provides the most obvious

sign of physical damage," various courts have found "that property can sustain physical loss or

damage without experiencing structural alteration." *Id.* at *5. *See also Wakefern Food Corp. v.*

*Liberty Mut. Fire Ins. Co.*, 406 N.J. Super. 524, 543, 968 A.2d 724, 736 (App. Div. 2009)

(holding that property can be physically damaged, without undergoing structural alteration, when

it loses its essential functionality). The court concluded that the packaging facility incurred

"physical loss or damage" when ammonia gas was discharged into the facility's air. . . and

rendered the facility temporarily unfit for occupancy." *Id.* at *8.

Other courts around the country have held that damage does not have to be "structural" to

be "physical," as long as it renders the property unusable for its intended purpose. *See, e.g.,*

*Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 437 P.2d 52 (1968) (where

gasoline vapors penetrated the foundation of the insured church and accumulated, rendering

building uninhabitable, the property was held to have suffered a "direct, physical loss"); *Matzner*

*v. Seaco Ins. Co.*, 1998 WL 566658 (Mass. Super. 1998) (holding that carbon monoxide levels in

an apartment building sufficient to render building uninhabitable were a "direct, physical loss").

In different circumstances, courts have also found that certain losses to property are not

covered by such policy terms. In *Great Northern Ins. Co. v. Benjamin Franklin Fed. S & L*

*Ass'n*, 793 F.Supp. 259 (D.Or.1990), asbestos was discovered in the insulation of the building

during a remodel, causing the building's tenant to threaten to vacate unless the asbestos was

removed. The building's owner filed a proof of loss under the property insurance policy for

anticipated removal of the asbestos, loss of use, and related expenses. The court determined that the asbestos, which had not been released into the building, was not a covered loss because "the building remained physically intact and undamaged." *Id.* at 263. Moreover, the court found that even if the asbestos was a "direct, physical loss," it would be excluded by the policy as a "pollutant." *Id.*

In this case, wildfire smoke infiltrated the interior of the theater, making it uninhabitable and unusable for holding performances. Like the home infiltrated by methamphetamine odor, or the furnace contaminated by lead particles, or the facility filled with ammonia, the theater filled with smoke was unusable for its intended purpose. Even though the loss or damage was not structural or permanent, the property experienced a loss of "essential functionality." Unlike in *Great Northern*, the smoke particles were present in the air, not trapped, harmless in the walls. Based on the case law, as discussed above, the Elizabethan Theatre sustained "physical loss or damage to property" when the wildfire smoke infiltrated the theater and rendered it unusable for its intended purpose.

### d. Smoke infiltration of the theater was a fortuitous event affording coverage.

Defendant argues in its response to Plaintiff's motion for partial summary judgment that the decision to cancel the performances was "voluntary" and therefore not a fortuitous event affording coverage. The court disagrees. Plaintiff has submitted extensive evidence that the air inside the theater was infiltrated by smoke from multiple local wildfires. The smoke was not within the Plaintiff's control. It is undisputed that the air contained an unhealthy level of particulates and that Plaintiff cancelled the performances out of concern for the health of patrons and OSF actors and staff.

### e. The fact that the Allen Elizabethan Theatre is only partially enclosed does not change the Court's analysis.

As discussed above, the smoke that infiltrated the theater caused direct property loss or damage by causing the property to be uninhabitable and unusable for its intended purpose. Defendant GAIC claims, in part, that this is impossible because the Allen Elizabethan Theatre is an "out-door," open-air facility, and therefore it is subject to the weather conditions and any passing winds that may come and go. Defendants do not dispute the fact that the theater is completely enclosed by a walled structure, and partially enclosed by a roof in certain portions of the facility. The conditions of the theater are uniquely exposed to the elements of the outdoors, but the insurance policy does not limit any of its terms based on this unique condition. Therefore, the open-air aspect of the theater does not affect the policy's coverage as to the damage to the property or the business income provision.

## II.    Defendant's motion for summary judgment regarding Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is denied.

Oregon law does not allow a first-party extra contractual tort claim for bad faith against an insurance company. *See, e.g,. Santilli v. State Farm*, 278 Or. 53, 562 P.2d 965 (1977); *Farris v. U.S. Fid. and Guar. Co.*, 284 Or. 453, 587 P.2d 1015 (1978). However, "[a] party may violate its [contractual] duty of good faith without also breaching the express provisions of the contract." *McKenzie v. Pac. Health & Life Ins. Co.*, 118 Or. App. 377, 380-81, 847 P.2d 879, 881 (1993) (citing *Elliot v. Tektronix, Inc.*, 102 Or. App. 388, 796 P.2d 361, *rev. den.* 311 Or. 13, 803 P.2d 731 (1990)). Accordingly, "a [contract] claim for breach of the duty of good faith may be pursued independently of a claim for breach of the express terms of the contract." *Id.* In the context of an insurance dispute, within defendant's obligation to pay all covered claims is the duty to determine, in good faith, whether a claim is covered, and to refrain from arbitrarily denying a claim. *Id.*

Plaintiff's second cause of action asserts that the insurance policy contains an implied

covenant of good faith and fair dealing, and that defendant GAIC breached this covenant by

failing and refusing to promptly and fairly investigate the Business Income and Extra Expense

claims made by Plaintiff.  Particularly, Plaintiff claims that:

a. GAIC unnecessarily required fourteen (14) OSF employees to submit to examinations under oath after it had already denied the Business Income and Extra Expense Claims;

b. GAIC required fourteen (14) OSF employees to submit to examinations under oath regarding the factual circumstances of OSF's claim that were unrelated to the only legal theory GAIC has ever provided as a basis for denying OSF's claims. There is no good faith reason to have required fourteen (14) examinations under oath when no amount of factual investigation would have changed GAIC's only legal theory for denial;

c. GAIC caused OSF to incur substantial costs responding to redundant, repeated, and immaterial document requests after it had already denied OSF's Business Income and Extra Expense Claims;

d. GAIC caused OSF to incur substantial costs responding to redundant, repeated, and immaterial document requests that were unrelated to the only legal theory GAIC has ever provided as a basis for denying OSF's Business Income and Extra Expense Claims. That includes demands for five years' worth of unrelated corporate board records, committee agendas, and minutes and all pre-read materials, regardless of subject matter, provided to board members, as well as employees' personal photographs. There is no good faith reason to have required OSF to incur these costs when no amount of factual investigation would have changed GAIC's only legal theory for denial.

e. GAIC caused OSF to incur substantial costs responding to its extensive demands for a detailed breakdown of OSF's total lost business income during periods of physical loss and/or physical damage between ticket refunds, exchanges, donations, and the issuance of vouchers, which, in turn, required OSF to dedicate staff resources to writing new software code to extract the detail sought by GAIC from existing accounting and box office data, even after GAIC had denied OSF's Business Income and Extra Expense Claims; and

f. GAIC caused OSF to incur substantial costs responding to its extensive demands for a detailed breakdown of OSF's total lost

business income during periods of physical loss and/or physical damage between ticket refunds, exchanges, donations, and the issuance of vouchers that was unrelated to the only legal theory GAIC has ever provided as a basis for denying OSF's claims, which, in turn, required OSF to dedicate staff resources to writing new software code to extract the detail sought by GAIC from existing accounting and box office data. There is no good faith reason to have required OSF to incur these costs when no amount of factual investigation would have changed GAIC's only legal theory for denial.

Complaint ¶ 38(a-f).

Plaintiff has not moved for summary judgment on this claim. Defendant has moved for summary judgment, but has not asserted specific facts or submitted evidence to show that GAIC's actions in investigating were taken promptly, fairly, and in good faith. It may very well be that this is the case, but on the record before the Court, judgment as a matter of law is not appropriate at this time.

While the Court finds that the defendant's coverage position is not taken in bad faith, due to the unique circumstances of the partially-enclosed, open-air facility of the Allen Elizabethan Theatre, the Plaintiff's claim stems from the extensive, allegedly unnecessary and over-broad investigation conducted by defendant. This is not a duplicative cause of action stemming from the same facts as the breach of the terms of the policy, but a separate claim based on the harm caused by the defendant's alleged misconduct in the course of the investigation. The Court cannot find as a matter of law, based on the evidence currently in the record, that defendant's actions were reasonable, fair, and in good faith. Therefore, Defendant's motion for summary judgment on this claim is denied.

**III.    Defendant's motion for summary judgment as to Plaintiff's claim for negligence is granted.**

Plaintiff brings its third cause of action for negligence based on defendant GAIC's breach of the standard of care set forth in the Oregon Unfair Claims Settlement Practices Act. Compl. ¶ 42. However, violations of the Act are not independently actionable, and are therefore appropriately dismissed on summary judgment. *Richardson v. Guardian Life Ins. Co. of Am.*, 161 Or. App. 615, 623-24, 984 P.2d 917, 923 (1999) (citing *Farris v. U.S. Fid. and Guar. Co.*, 284 Or. 453, 458, 587 P.2d 1015 (1978)). Additionally, the facts alleged in this claim are the same as alleged in the prior claim for breach of the implied duty of good faith and fair dealing. Therefore this claim is duplicative. It is dismissed with prejudice.

## ORDER

For the forgoing reasons, the Plaintiff's motion for partial summary judgment (#17) as to the first claim for relief is GRANTED. Defendants' motion for summary judgment (#25) is GRANTED in part and DENIED in part. Plaintiff's third claim is dismissed with prejudice. Plaintiff's second claim for breach of the implied covenant of good faith, and Plaintiff's damages as to the first claim, are issues of fact for a jury to resolve at trial.

It is so ORDERED and DATED this ____ day of June 2016.

_____
MARK D. CLARKE
United States Magistrate Judge